**Exhibit 1**

**12-Person Jury**

Return Date: No return date scheduled
Hearing Date: No hearing scheduled
Courtroom Number: No hearing scheduled
Location: No hearing scheduled

FILED
2/16/2021 12:00 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021L001631

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

| | |
|---|---|
| BRUCE BELLAMY, | ) |
| | ) |
| Plaintiff, | ) No. **2021L001631** |
| | ) |
| v. | ) |
| | ) |
| RAYTHEON TECHNOLOGIES CORP., | ) |
| | ) |
| Defendant. | ) **JURY TRIAL DEMANDED** |
| | ) |

### COMPLAINT

Plaintiff Bruce Bellamy, by and through his attorneys, PMJ PLLC and IALPG PTY LTD,

files this Complaint against the above-named Defendant Raytheon Company (f/k/a United

Technologies Corp.) (the "Defendant"), and states as follows:

### PARTIES

1.      The Plaintiff is a citizen of Australia, born on January 25, 1964, and domiciled in

Brisbane, Australia. He regularly made international flights to the United States, including

Chicago, Illinois.

2.      The Defendant is a Delaware corporation with a principal place of business and

corporate headquarters located 2021 S. First Street, Suite 207, Champaign, Illinois, and other

offices located in Chicago, Illinois.

3.      This Court has personal jurisdiction over the Defendant because the Defendant has

a principal place of business located in this state, regularly does business within this state, and the

misconduct of Defendant that forms the basis of this Complaint occurred in Chicago or was

directed from Chicago.

FILED DATE: 2/16/2021 12:00 AM 2021L001631

FILED DATE: 2/16/2021 12:00 AM  2021L001631

## GENERAL ALLEGATIONS

4.      At all times relevant to this Complaint, the Defendant was engaged in the business of designing, manufacturing, assembling, testing, servicing, marketing, and promoting commercial aircraft parts, including the Auxiliary Power Units (an "APU" or "APUs") which are the subject of this Complaint, as well as providing information and warnings about such parts.

5.      The Defendant's parts, including APUs, are designed and incorporated into commercial aircraft manufactured by Airbus Group S.E. ("Airbus"). APUs are secondary power supplies that can power an aircraft's secondary systems, including its air conditioning systems, and are less expensive to operate than the aircraft's engines, especially when the aircraft is on the ground. APUs may also be used in-flight if one or more engine generators has failed.

6.      In this case, the Defendant's predecessor's APUs (type APS3200, originally manufactured by Hamilton Sundstrand) were incorporated into the "bleed air" systems of Airbus aircraft.

7.      Hamilton Sundstrand was a corporation that manufactured and supported aerospace and industrial products for worldwide markets. It was a subsidiary of United Technologies Corporation, formed from the merger of Hamilton Standard and Sundstrand Corporation in 1999. In 2012, Hamilton Sundstrand merged with Goodrich Corporation to form UTC Aerospace Systems. In 2018, UTC Aerospace Systems and Rockwell Collins combined to form Collins Aerospace making it a business unit of Raytheon Technologies Corporation.

8.      In a "bleed air" system, the APU pulls outside air into the aircraft's engines which is then passed through an air-conditioning pack, where it is cooled and combined with recirculated cabin air entering the cabin (the "Bleed Air System").

2

FILED DATE: 2/16/2021 12:00 AM   2021L001631



**Figure 1. Schematic Diagram of APU Bleed Air System**

In a Bleed Air System, the outside air often becomes contaminated by heated jet engine oil, hydraulic fluid and other contaminants or the toxic by-products of such chemicals. APUs can also ingest exhaust engine gases.[1]

      9.      Air contamination may occur due to a primary event (an immediate and identified failure or leak that occurs contemporaneous with the contaminated air event) and/or a secondary event (where jet engine oil, hydraulic fluid, contaminants or the heated and pyrolyzed by-products of such, leaks, weeps, wisps, seeps or burps out over time, becomes lodged in the Bleed Air System and causes delayed cabin air contamination) or a combination of both. Sometimes the contaminated air is odorless and at other times is characteristic of certain sources and causes, as

---

[1] *See* Airbus A320 Flight Crew Techniques Manual at PR-NP-SP-20 P 4/10 which provides: "If the APU is necessary during or after taxi (e.g. when takeoff performance requires APU bleed), the flight crew may set the APU bleed to ON, in order to reduce fuel consumption. This opens the crossbleed valve and automatically closes the engine bleed. As the bleed air is not supplied by the engines, the fuel consumption is reduced. **However, the use of APU bleed can lead to exhaust gases ingestion into the air conditioning system.**" (emphasis added).
In addition, high power take-offs can also produce fumes and a way to mitigate that is to use APU bleed for take-off so no engine air comes into the cabin, or to turn the Bleed air off completely.

3

set out Airbus A320 FCTM Smoke Origin Identification and Fighting table at PR-AEP-SMOKE

P6/106/10:

> The crew can notice some cabin odors. The table below references the cabin odors list with suspected origins to help the flight crew to improve the communication coordination with the cabin crew.

| DESCRIPTION OF ODORS | SUSPECTED CAUSE (MOST REPORTED LISTED FIRST) |
|---|---|
| Acrid | Electrical Equipment/IFE<br>Engine Oil Leak |
| Burning | Electrical Equipment<br>Galley Equipment<br>Bird Ingestion |
| Chemical | Contaminated Bleed Outs<br>APU Ingestion |
| Chlorine | Smoke Hood<br>Blocked Door Area Drain |
| Electrical | Electrical Equipment |
| Dirty Socks | APU or Engine Oil Leaks |
| Foul | Lavatories |
| Fuel | APU FCU/Fuel Line |
| Oil | Engine or APU Oil Leak |
| Skydrol | Engine Hydraulic |
| Sulphur | Wiring<br>Avionics Filter Water Contamination<br>Light Bulb |

10.     Contaminated cabin air is a toxic soup of chemicals including, but not limited to, neurotoxins such as organophosphates. Organophosphates are chemical compounds also found in insecticides, herbicides, pesticides, nerve agents, and nerve gases such as Sarin gas. Inhaling contaminated cabin air can cause short-term or transient symptoms as well as permanent and serious personal injury.

11.     Contaminated air events can also cause serious and potentially catastrophic safety issues. The Defendant is aware of incidents where flight crew have become ill or incapacitated because of contaminated air events in-flight. During a contaminated air event, flight crews can –

4

without warning – be subjected to poisonous cabin air that can substantially reduce their capabilities or temporarily disable them. Such events constitute a serious threat to flight safety. The Material Safety Data Sheet for A320 engine oil identifies, under 'Hazardous Substances,' an organophosphate - tricresyl phosphate - which is odorless in a pure form. The hydraulic oil (which can contaminate the APU air inlet and cabin air) Material Safety Data Sheet for A320 hydraulic oil under identifies tributyl phosphate which is odorless in pure form. This oil prompts a "dirty socks smell when moisture is present but is otherwise odorless so fumes can exist without odor.)

12.     The Defendant has known about – and has refused to address – this threat to human life for decades. In 2012, this issue led to the death of a British Airways pilot, Richard Westgate. Post-mortem testing of Mr. Westgate's blood and tissue showed elevated autoantibody markers, indicative of neural degeneration. Published medical articles about Mr. Westgate's death concluded that he suffered a nervous system injury consistent with organophosphate-induced neurotoxicity. Duke University Professor Abou-Donia, a researcher dedicated to better understanding contaminated air injuries, noted that Westgate's injury was "one of the worst cases of organophosphate poisoning [he had] come across."

13.     Despite Mr. Westgate's widely-reported and documented death, the Defendant has refused to take remedial action to fix the design of its APUs and their reliance on bleed air. The Defendant has failed to research, develop, design, install, implement or provide sensors or alarms to notify the flight crew about contaminated air events so immediate action can be taken to reduce or minimize exposure. The Defendant has also failed to research, develop, design, implement, retrofit or install an air converter or filter into its APUs to remove, reduce or mitigate the toxins in contaminated air events. The Defendant has also knowingly and intentionally failed to provide adequate warnings or training about the dangers of these events to pilots, including the Plaintiff.

5

**PILOTS RELY ON PARTS MANUFACTURERS, LIKE THE DEFENDANT, TO
SAFEGUARD THEIR WORK ENVIRONMENT**

14. Commercial aircraft are exceedingly complex products that incorporate parts manufactured by dozens, possibly hundreds of parts manufacturers. Those parts manufacturers, including the Defendant, are often the only parties who understand the capabilities and dangers that those parts present to operators of the final product, i.e., the commercial aircraft operated by certified pilots relying on information provided to them by the parts manufacturers, the commercial aircraft manufacturers, and their employer airlines.

15. Pilots are, by necessity and by law, central to the design and operation of civil air transport category aircraft. Preserving pilot's working environment from contaminants is a federally mandated requirement for aircraft manufacturers in the United States like the Defendant.

16. For example, several Federal Aviation Administration ("FAA") Regulations provide that it is mandatory for aircraft manufacturers to design systems and install equipment, such that "qualified flightcrew members trained in their use can safely perform all of the tasks associated with the systems' and equipment's intended functions." 14 CFR §25.1302. As integral safeguards for the operation of commercial aircraft, pilot safety is clearly within the Defendant's remit for aircraft and aircraft component design.

17. FAA Regulations impose requirements on the Defendant related to the air quality in civil aircraft in relation to both the cockpit and cabin. 14 CFR § 25.831(b) – Ventilation, provides that the "Crew and passenger compartment air must be free from harmful or hazardous concentrations of gases or vapors" and § 25.831(c) mandates "There must be provisions made to ensure that the conditions described in para (b) of this section are met after reasonably probable failure or malfunctioning of the ventilating, heating, pressurization or other systems and equipment."

6

FILED DATE: 2/16/2021 12:00 AM    2021L001631

18. By failing to adhere to such responsibilities, including making minor, inexpensive design changes to its APUs, the Defendant has consistently put profits above the safety of passengers and flight crews.

19. Pilots rely entirely on information regarding the safe operation of its aircraft either directly, or through pilots' employer airlines, which rely entirely on information provided by aircraft manufacturers, like Airbus. In turn, Airbus relies wholly on information provided by parts manufacturers, like the Defendant. In short, if the parts manufacturer omits information regarding the safe operations of systems that incorporate its parts, that information cannot reach the pilots as recent circumstances and history in relation to the Boeing 737 MAX, as outlined in the US Department of Justice and Boeing Deferred Prosecution Agreement Statement of Facts, has shown.[2]

## TOXIC FUMES EVENTS EXPERIENCED BY PLAINTIFF

20. Toxic "bleed air" events caused by the Defendant's defective APUs were so common that Airbus wrote about fumes sources in its technical magazine ("FAST"),[3] and created a standard "COS Reporting Sheet" (a "COS Report") for pilots and crew to record them. Additionally, in the event of an unusual occurrence that could affect the safety of a flight's crew and passengers, pilots were required to prepare a Serious Incident Report (an "SIR"). The Plaintiff also had the option of filing a "Tiger Occurrence Report" of toxic air events to his employer airline,

---

[2] In the case of Boeing, it purposefully defrauded the FAA by omitting relevant and necessary aircraft specification and pilot training information from documents submitted to the FAA AEG for certification of Boeing 737 MAX series aircraft, which dearth of information omission led to pilots agreeing to fly the MAX who would not have flown it if they knew the true dangers of the aircraft's new and untested aircraft systems (see *In re: Boeing 737 MAX Pilots Litigation,* 1:19-cv-05008, ND Ill, ED, and the various air crash cases of victims of the Lion Air and Ethiopian Airlines wrongful death cases in Illinois).

[3] For example, see article "A clean APU means clean cabin air" in #52, Airbus technical magazine, FAST (Flight Airworthiness Support Technology), August 2013.

Tiger Air. The Plaintiff in this case was required to prepare multiple reports detailing contaminated air events caused by failed APUs manufactured by the Defendant.

***Sept. 11, 2017 – Toxic Fumes Event No. 1***

21.     On September 11, 2017, the Plaintiff filed a Tiger Occurrence Report (eReport TSO3456-17), which detailed toxic fumes event in Melbourne, Australia, that required the Plaintiff to shut down the aircraft's engines after a "strong oily odor filled the flight deck" just 10 seconds after the APU, manufactured by the Defendant, was activated. The small had also been observed to a lesser extent prior to takeoff of the same flight in Brisbane.

***Feb. 23, 2018 – Toxic Air Event No. 2***

22.     On February 23, 2018, the Plaintiff filed an Airbus COS detailing a toxic fumes event reported by the flight crew that occurred in mid-flight. The Plaintiff was able to clear the "strong oil smell" in the cabin by turning Pack #2 to OFF.

***Feb. 25, 2018 – Toxic Air Event No. 3***

23.     On February 24, 2018, filed a second Tiger Occurrence Report (eReport TSO760-18) in less than two days detailing a fumes event. The Plaintiff reported that one of the flight attendants who was also on the Feb. 23, 2018 flight reported sleeping the entire day following that event. The Plaintiff reported that, following the two events, he felt "more than the usual tiredness" following the events and that he would be unable to fly, as scheduled, the following day.

24.     The Plaintiff expressed concern to his employer airline that the ground engineering crews could "only service to the manual," because there was no procedure for when the APU is

8

not shut down properly and maintenance engineers cannot take action contrary to the manual which leads to poor solutions being employed as regards underfilling the APU to account for a sump drainage issue that typically leads to overfilling.

*March 21, 2018 – Toxic Fumes Event No. 4*

25.     On March 21, 2018, the Plaintiff filed an Airbus COS Report and a Tiger Occurrence Report (eReport TSO1114-18) detailing a toxic fumes event that included reports by the flight crew of a strong odor of "dirty socks" and a "metallic" smell in the mid-cabin prior to takeoff and upon descent. The fumes were so overwhelming upon descent that the Plaintiff had to "depressurize and vent" the cabin while still in flight. The flight crew was treated by Tiger Air contracted physicians upon landing; one flight attendant was so distraught by the occurrence after having several other fumes occurrences herself, that she broke down in tears.

26.     Prior to this occurrence, the Plaintiff had become so concerned with the effects of these repeated toxic fumes events on his health that he carried a personal, atmospheric chemical sensor on each flight. Samples from the sensor during this incident indicated the presence of extremely high levels of potentially deadly toxins, including tricresyl phosphate ("TCP"), tri-butyl phosphate, and hydraulic fluid components, which are strongly indicatives of a "bleed air" event as well as hydraulic fluid contamination of the air. Since TCP is an indicator of a bleed air problem, and depending on the temperature of the compressor section of the turbine at the time this sample was taken, i.e., take off and also included descent, this also likely indicates CO and Formaldehyde exposure.

FILED DATE: 2/16/2021 12:00 AM    2021L001631

9

*June 29, 2018 - Toxic Fumes Event No. 5*

27.     On June 28, 2019, the Plaintiff flew an Airbus aircraft that incorporated an APU manufactured by the defendant from Melbourne to Perth. The pilot on a previous flight of the aircraft earlier that day had reported a toxic fumes event Melbourne to Gold Coast causing a Flight Attendant to vomit several times. Engineering attended the aircraft for further assessment. During the descent fumes were noticed. The Plaintiff moved to the terminal building for clean air and reported a light headache. The return scheduled flight was cancelled.

*June 29, 2018 – Toxic Fumes Event No. 6*

28.     On June 29, 2018, the Plaintiff flew an Airbus aircraft that incorporated an APU manufactured by the Defendant from Perth to Melbourne. Although the Plaintiff did not notice any odors that typically signaled a toxic fumes event, he subsequently felt unusually tired and disoriented. After, the Cabin Crew reported smelling the same 'dirty socks' smell as the previous day but less strong. An analysis of samples taken from this flight on the atmospheric chemical sensor revealed significant exposure to extremely high levels of TCP.

*March 21, 2019 – Toxic Fumes Event No. 7*

29.     On March 21, 2019, the Plaintiff boarded an Airbus aircraft equipped with an APU manufactured by the Defendant. He was a passenger on the flight, occupying a "jump seat." Nonetheless, the Plaintiff experienced another toxic fumes event and filed a Tiger Occurrence Report (eReport TSO991-19) to record the event. His report stated as follows:

> I was non-operating crew in the jump seat. I have to fill in the field on the details
> page or the form will not be accepted. My role is Mel A320 Captain but not a
> crew member on this flight.

10

FILED DATE: 2/16/2021 12:00 AM   2021L001631

The Captain asked "Do you smell that?" on start of engine 2 on pushback. I acknowledged yes.

The smell was transient damp slightly oily smell, and it cleared after about 15 seconds. This aircraft could well use a Pack burn out.

***It has become common for crew to accept smells that should not be present.***

***February 6, 2020 Toxic fumes event No 8.***

Pursuant to Report eReport WHS 3-20, on shutdown of the aircraft three crew members felt unwell after smelling fumes. The crew stood themselves down after not improving after 40 minutes with symptoms of nausea, headache and light headedness. The Engineers found a load compressor (APU air pump) oil weep.

30.     As a result of his exposure to the foregoing toxic fumes events, the Plaintiff suffered from fatigue, severe bronchitis, coughing blood, nausea, and skin irritation, his pilot license was suspended due to lack of fitness, and he was unable to work for more than 400 days. After repeated visits to doctors and hours spent in a hyperbaric chamber, the Plaintiff alleviated most symptoms but remains sensitive to fumes of any kind, including those still repeatedly present on aircraft incorporating APUs manufactured by the Defendant.

31.     The Plaintiff's pilot license was reinstated in September 2019, but he suffered three significant toxic fumes events in early 2020. As a result, Plaintiff remains unable to work as a pilot.

32.     As a result of these recent events, Plaintiff's pilot license has again been suspended due to unfitness. The Plaintiff has suffered loss of wages and wage earning capacity in the past and in the future.

33.     The Defendant affirmatively represented that the "bleed air systems" incorporating the Defendant's APUs were safe, or failed to disclose that the Defendant's APUs would regularly

11

FILED DATE: 2/16/2021 12:00 AM  2021L001631

leak during normal operations and/or fail resulting in the exposure of the Plaintiff to deadly chemicals without warning or safety devices. By reason of the Defendant's decisions, the subject flight crew was exposed to toxic air, the environmental control system on the subject aircraft lacked converters or filters which would have reduced or eliminated the toxic fumes, and there was no sensor or warning on the subject aircraft to warn the flight crew so suitable remediation action could be taken.

34.     By reason of the Defendant's decisions, the Plaintiff was not properly warned of the health dangers of contaminated cabin air and were not equipped to respond to the Several incidents described herein.

35.     The Defendant knew of the defects in the subject aircraft, knew that because of such defects the cabin air was not free from harmful or hazardous concentrations of contaminants, was on notice that the defects were likely to cause harmful fume events and injury yet failed to adequately warn or instruct on the aircraft defects, failed to remedy the known defect in the subject aircraft, failed to discover the dangerous conditions when such could have been discovered and/or failed to take affirmative action to avoid injury to the Plaintiff and others.

36.     The personal injuries suffered by the Plaintiff included findings of the presence of TCP in his system, experiencing shortness of breath, paroxysmal wheeze, low-grade non-specific nausea, disabling fatigue, recurrent respiratory syndrome with systemic and neurological symptoms, sporadic bronchitis, neurological syndrome secondary to a chronic chemical exposure, and he continues to have a cough without sputum production, wheezing on forced expiration; low energy and difficulty concentrating. He continues to suffer from mental and physical fatigue, and lack of energy at various parts of the day with headaches preventing his continued employment as a pilot.

12

FILED DATE: 2/16/2021 12:00 AM   2021L001631

## COUNT I
### Strict Liability – Design Defect
### (Illinois law)

37.     The Defendant manufactured, designed, promoted, marketed and sold the subject aircraft. At the time the APUs left the Defendant's custody and control, they were defective and unreasonably dangerous because:

    a.  its design rendered the operating of commercial aircraft incorporating the APUs unreasonably dangerous;

    b.  the danger of this design was beyond that contemplated by the intended user, *i.e.*, pilots, with ordinary knowledge common to the community as to its characteristics; and

    c.  the benefits of this design are outweighed by the design's inherent risk of danger.

38.     The Defendant's design of its APUs and their incorporation into commercial aircraft made such aircraft unreasonably dangerous in one of more of the following respects:

    a.  any ventilation system incorporating the Defendant's APUs allows "bleed air," which can become contaminated with dangerous toxins, to enter the cabin and cockpit air;

    b.  the APUs leaked during normal operations;

    c.  the APUs lacked adequate air quality monitors, sensors or alarms;

    d.  the Defendant provided no safeguards or systems to identify the source of the contaminated air or mitigate or prevent contamination of the cabin air; and

    e.  the APUs lacked adequate or appropriate converters or filters to reduce, remove or eliminate bleed air contamination.

FILED DATE: 2/16/2021 12:00 AM  2021L001631

f.   The design of the oil replenishing of the APU was plagued by repeated errors by engineering staff despite defined procedures causing repeated occurrences of overfilling and overfill draining of oil that contaminated the aircraft fuselage and subsequently the APU air intake.

39.   By reason of the foregoing, the Defendant's APUs and the subject aircraft incorporating those APUs was unreasonably dangerous and defective, and the Defendant is strictly liable for the damages sustained by the Plaintiff.

WHEREFORE, Plaintiff requests judgment against Defendant in an amount of money in an amount to be determined by a jury.

## COUNT II
### Strict Liability – Defective Warnings/Instructions
### (Illinois law)

40.   Plaintiff re-alleges all previous paragraphs as if set forth verbatim herein.

41.   The Defendant failed to adequately warn of the danger of toxic cabin air and/or failed to adequately instruct on the proper use of aircraft incorporating its APUs to avoid cabin air contamination in one of more of the following respects:

a.   the APUs lacked proper warnings regarding the potential of the air supply system to become contaminated;

b.   the APUs lacked proper warnings regarding the identification or detection of contaminated air;

c.   the APUs lacked proper warnings about the dangers associated with leakage during normal operations;

d.   the APUs lacked proper warnings regarding the health dangers of exposure to contaminated air; and

14

FILED DATE: 2/16/2021 12:00 AM 2021L001631

e.   the Defendant failed to adequately warn or instruct on how to respond, contain or reduce the danger of contaminated air events.

42.   The design of the oil replenishing of the APU was plagued by repeated errors by engineering staff despite defined procedures causing repeated occurrences of overfilling and overfill draining of oil that contaminated the aircraft fuselage and subsequently the APU air intake. By reason of the foregoing, the APUs and aircraft incorporating the Defendant's APUs were unreasonably dangerous and defective, and the Defendant is strictly liable for the damages sustained by the Plaintiff.

WHEREFORE, Plaintiff requests judgment against the Defendant in an amount of money in an amount to be determined by a jury.

### COUNT III
### Negligence
### (Illinois law)

43.   Plaintiff re-alleges all previous paragraphs as if set forth verbatim herein.

44.   At all times relevant hereto, the Defendant owed a duty to the Plaintiff to use reasonable care in designing, manufacturing, assembling, testing, maintaining, servicing, selling, marketing, promoting and providing warnings or instructions about its APUs so as not to cause Plaintiff severe personal injuries and pain and suffering.

45.   The Defendant negligently breached its duty of care owed to the Plaintiff through one or more of the following negligent acts and omissions, when the Defendant:

a.   negligently designed, manufactured, assembled and sold the subject APUs such that its ventilation system allowed contaminated "bleed air" to enter the breathing zone of the aircraft;

15

FILED DATE: 2/16/2021 12:00 AM 2021L001631

b. negligently designed, manufactured, assembled and sold the APUs without an adequate or appropriate air quality monitor, sensor or alarm to detect "bleed air" contamination, to allow the flight crew to identify the source of such contamination and/or permit the flight crew to mitigate, reduce or prevent fume events;

c. negligently designed, manufactured, assembled and sold the APUs to commercial airline manufacturers without adequate or appropriate converters or filters to protect cabin air from contamination;

d. negligently designed, manufactured, assembled and sold the APUs without proper warnings or instructions regarding the potential of the air supply system to become contaminated or the danger of exposure to such contaminated air;

e. negligently designed, manufactured, assembled and sold the APUs without knowing the chemical composition of heated aviation jet engine lubricating oil or hydraulic fluid or the byproducts of such as well as the noxiousness of these toxins;

f. negligently designed, manufactured, assembled and sold the subject APUs without knowing what chemicals or byproducts are created when aviation jet engine lubricating oil or hydraulic fluid are pyrolysed consistent with those experienced in the engines;

g. negligently designed, manufactured, assembled and sold the APUs without properly testing heated aviation jet engine lubricating oil or hydraulic fluid to fully understand the toxic chemicals and byproducts of such during normal and abnormal operations;

h. negligently designed, manufactured, assembled and sold the subject APUs without knowing the quality of the bleed cabin air;

16

FILED DATE: 2/16/2021 12:00 AM   2021L001631

i.    negligently failed to incorporate a proper and effective environmental control system or air supply on aircraft incorporating the APUs;

j.    negligently failed to properly test the subject aircraft before selling or distributing the APUs;

k.    negligently failed to adequately maintain, service, retrofit and/or inspect the APUs or add the needed safer alternatives;

l.    negligently represented, promoted and marketed the APUs as being safe and failed to provide adequate warnings and instructions about the APUs; and

m.    the Defendant was otherwise negligent and careless.

46.    The Defendant owed a duty to adequately warn and instruct the Plaintiff about the dangers of its APUs of which it knew, or, in the exercise of ordinary care, should have known, at the time the product left the Defendant's control.

47.    The Defendant negligently failed to warn the Plaintiff of the defective and unreasonably dangerous conditions of its APUs.

48.    The Defendant misrepresented the safety of its APUs and the dangers of air cabin contamination to the Plaintiff.

49.    As a direct and proximate result of one or more of the aforesaid negligent acts and omissions of the Defendant, the Defendant caused the Plaintiff to suffer personal injuries and damages.

WHEREFORE, the Plaintiff requests judgment against the Defendant in an amount of money in an amount to be determined by a jury.

17

FILED DATE: 2/16/2021 12:00 AM    2021L001631

## COUNT IV
### Fraud
### (Illinois law)

50.     Plaintiff re-alleges all previous paragraphs as if set forth verbatim herein.

51.     The Defendant, having undertaken to design, create, research, develop, manufacture, market, and promote its APUs, owed a duty to provide a safe and appropriate air system as well as accurate and complete information regarding its product.

52.     Instead, the Defendant fraudulently provided information and omissions to Plaintiff, and falsely and deceptively sought to create the image and impression that the air cabin in its aircraft was safe.

53.     As described in detail above, the Defendant purposefully concealed, failed to disclose, misstated, downplayed, and understated the health hazards and risks associated with cabin air contamination on aircraft incorporating its APUs.

54.     The Defendant deceived the Plaintiff, and other flight crew and passengers, by concealing, misstating, and downplaying the incidence rate, seriousness and health effects of fume events.

55.     The Defendant falsely and deceptively concealed relevant and material information from flight crew, flight attendants and passengers and minimized concerns regarding the safety of its aircraft air system by failing to provide adequate information to its airline manufacturer customers, like Airbus.

56.     The Defendant did not properly investigate nor report accurately the results of its analysis of cabin air contamination.

57.     As a direct and proximate result of one or more of the aforesaid fraudulent acts of the Defendant, the Defendant caused Plaintiff to suffer severe personal injuries and damages.

18

FILED DATE: 2/16/2021 12:00 AM   2021L001631

WHEREFORE, Plaintiff requests judgment against the Defendant in an amount of money in an amount to be determined by a jury.

## COUNT V
## Negligent Misrepresentation
## (Illinois law)

58.     Plaintiff re-alleges all previous paragraphs as if set forth verbatim herein.

59.     As set forth above, the Defendant made multiple misrepresentations and omissions regarding safety of the cabin air aircraft incorporating its APUs without reasonable care as to the truthfulness of those statements.

60.     The Defendant knew or should have known that pilots and crew, like the Plaintiff, would rely on those statements and omissions.

61.     The Plaintiff justifiably relied on the misrepresentations and omissions to his detriment.

62.     The Defendant's conduct caused Plaintiff short term and long term health problems and injuries including pain, suffering, mental anguish, emotional distress, physical impairment, loss of normal enjoyment of life, medical bills and expenses as well as loss of wage earning capacity, in the past as well as reasonably anticipated in the future.

WHEREFORE, the Plaintiff requests judgment against the Defendant in an amount of money in an amount to be determined by a jury.

### DEMAND FOR JURY TRIAL

63.     The Plaintiff demand a jury trial on all claims so triable in this action.

WHEREFORE, the Plaintiff respectfully requests entry of a judgment in his favour and against the Defendant , together with costs, attorney fees and such other damages as may be allowed by this Court under law.

19

FILED DATE: 2/16/2021 12:00 AM   2021L001631

Dated: February 12, 2021
Chicago, Illinois

Respectfully submitted by:

Patrick M. Jones, One of the Attorneys
for the Plaintiff

PMJ PLLC

Patrick M. Jones
Sarah M. Beaujour
The National Building
125 South Clark Street
Chicago, Illinois 60603
Tel: (312) 255-7976
Email: pmj@pmjpllc.com
Email: sb@pmjpllc.com

and

IALPG PTY LTD (t/as International Aerospace Law & Policy Group)

Joseph C. Wheeler
1D, 7/139 Junction Road
Clayfield, Queensland, Australia 4011
Tel: +61 7 3040 1099
Email: jwheeler@ialpg.com

Attorneys for the Plaintiff

20

Return Date: No return date scheduled
Hearing Date: No hearing scheduled
Courtroom Number: No hearing scheduled
Location: No hearing scheduled

Civil Action Cover Sheet - Case Initiation

(12/01/20) CCL 0520

### IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT, LAW DIVISION

BRUCE BELLAMY

v.

RAYTHEON TECHNOLOGIES CORP.

No. _____

FILED
2/16/2021 12:00 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021L001631

12196281

## CIVIL ACTION COVER SHEET - CASE INITIATION

A Civil Action Cover Sheet - Case Initiation shall be filed with the complaint in all civil actions. The information contained herein is for administrative purposes only and cannot be introduced into evidence. Please check the box in front of the appropriate case type which best characterizes your action. Only one (1) case type may be checked with this cover sheet.

Jury Demand ☐ Yes ☐ No

(FILE STAMP)

### PERSONAL INJURY/WRONGFUL DEATH

CASE TYPES:
- ☐ 027 Motor Vehicle
- ☐ 040 Medical Malpractice
- ☐ 047 Asbestos
- ☐ 048 Dram Shop
- ☒ 049 Product Liability
- ☐ 051 Construction Injuries
  (including Structural Work Act, Road Construction Injuries Act and negligence)
- ☐ 052 Railroad/FELA
- ☐ 053 Pediatric Lead Exposure
- ☐ 061 Other Personal Injury/Wrongful Death
- ☒ 063 Intentional Tort
- ☐ 064 Miscellaneous Statutory Action
  (Please Specify Below**)
- ☐ 065 Premises Liability
- ☐ 078 Fen-phen/Redux Litigation
- ☐ 199 Silicone Implant

### TAX & MISCELLANEOUS REMEDIES

CASE TYPES:
- ☐ 007 Confessions of Judgment
- ☐ 008 Replevin
- ☐ 009 Tax
- ☐ 015 Condemnation
- ☐ 017 Detinue
- ☐ 029 Unemployment Compensation
- ☐ 031 Foreign Transcript
- ☐ 036 Administrative Review Action
- ☐ 085 Petition to Register Foreign Judgment
- ☐ 099 All Other Extraordinary Remedies

By: Patrick M. Jones

(Attorney)      (Pro Se)

### COMMERCIAL LITIGATION

CASE TYPES:
- ☐ 002 Breach of Contract
- ☐ 070 Professional Malpractice
  (other than legal or medical)
- ☒ 071 Fraud (other than legal or medical)
- ☐ 072 Consumer Fraud
- ☐ 073 Breach of Warranty
- ☐ 074 Statutory Action
  (Please specify below.**)
- ☐ 075 Other Commercial Litigation
  (Please specify below.**)
- ☐ 076 Retaliatory Discharge

### OTHER ACTIONS

CASE TYPES:
- ☐ 062 Property Damage
- ☐ 066 Legal Malpractice
- ☐ 077 Libel/Slander
- ☐ 079 Petition for Qualified Orders
- ☐ 084 Petition to Issue Subpoena
- ☐ 100 Petition for Discovery

** _____
_____

Primary Email: pmj@pmjpllc.com

Secondary Email: jwheeler@ialpg.com

Tertiary Email: sb@pmjpllc.com

**Pro Se Only:** ☐ I have read and agree to the terms of the *Clerk's Office Electronic Notice Policy* and choose to opt in to electronic notice form the **Clerk's Office** for this case at this email address: _____

### IRIS Y. MARTINEZ, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS